# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

BRITNEY S.,

   *Plaintiff,*

*v.*

KILOLO KIJAKAZI,
Acting Commissioner of
Social Security Administration,

   *Defendant.*

_____/

Case No. 1:23-cv-10334

Patricia T. Morris
United States Magistrate Judge

## MEMORANDUM OPINION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 7, 9)

## I.  CONCLUSION

  For the reasons set forth below, Plaintiff Britney S.'s Motion for Summary Judgment is **DENIED** (ECF No. 7), Defendant's Motion for Summary Judgment is **GRANTED** (ECF No. 9), and the Commissioner's final decision is **AFFIRMED**.

## II.  ANALYSIS

### A.  Introduction and Procedural History

Plaintiff's application for Title II disability was filed on April 22, 2019.  (ECF No. 4-1, PageID.252).  Plaintiff alleged she became disabled on June 10, 2019.[1]  (*Id.* at PageID.72, 96).  The Commissioner denied these claims initially on September 25, 2019.  (*Id.* at PageID.124).  Plaintiff then requested  a hearing before an administrative law judge ("ALJ"), which took place on December 6, 2021.  (*Id.* at PageID.66, 135).  The ALJ issued a decision on January 20, 2022, finding that Plaintiff was not disabled.  (*Id.* at PageID.59).  And the Appeals Council denied reviewed on December 8, 2022.  (*Id.* at PageID.20).

Following the Appeals Council's decision, Plaintiff sought judicial review on February 8, 2023.  (ECF No. 1).  The parties consented to the undersigned "conducting any or all proceedings in this case, including entry of a final judgment on all post-judgment matters."  (ECF No. 6, PageID.794).  The parties have filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 7, 9).

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in

---

[1] Plaintiff initially alleged she became disabled on April 20, 2018.  (ECF No. 4-1, PageID.71, 275).  However, during her hearing before the ALJ she amended the alleged onset date to June 10, 2019, on the advice of counsel.  (*Id.* at PageID.72, 96).

the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones*

4

*v. Comm'r of Soc. Sec.*, 3336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 4-1, 59). At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity ("SGA") from June 10, 2019 through her date last insured of September 30, 2019. (*Id.* at PageID.47). At Step Two, the ALJ found the following impairments severe: a fracture of the lumbar vertebrae, with spinal cord lesion, obesity, anxiety, depression, and attention-deficit hyperactivity disorder. (*Id.*). The ALJ also noted Plaintiff suffered from hypertension, but found it to be

non-severe as there was no evidence of end organ damage or more than conservative treatment being taken. (*Id.*). At Step Three, she found that none of the impairments, either independently or in combination, met or medically equal in severity or duration the criteria listing of 1.15, 12.04, 12.06, or 12.11. (*Id.* at 47–48).

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) but with additional limitations. (*Id.* at PageID.50). Plaintiff can occasionally climb stairs, crouch, crawl, kneel, and stoop or bend, but should avoid workplace hazards such as dangerous, moving machinery and unprotected heights. (*Id.*). Plaintiff is unable to climb ladders, ropes, or scaffolds. (*Id.*). Plaintiff is able to perform simple routine work (i.e., the type of work that requires only simple decisions and thus no complex questions) which is not at a production-rate pace. (*Id.*). At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.56). Finally at Step Five, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy, which included address clerk, order clerk, final assembler, surveillance system monitor, and document preparer. (*Id.* at PageID.58). Accordingly, the ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, at any time from June 10, 2019, the amended alleged onset date, through September 30, 2019, the date last insured. (*Id.* at PageID.59).

**E. Administrative Record**

### 1. Overview of Medical Evidence

### a. Treatment Notes

In April 2018, Plaintiff fell from a horse which resulted in her sustaining a significant back injury. (ECF No. 4-1, PageID.352, 382). The incident occurred out of state and she did not immediately seek medical attention but instead sought care upon returning to Michigan. (*Id.* at PageID.382). Imaging of her spine revealed an anterior wedge compression deformity, and she was concluded to have experienced an L1 compression fracture.

In August 2018, Plaintiff underwent a CT spinal examination, and the findings noted that she had L1 vertebroplasty but was stable. (*Id.* at PageID.698–99). In November 2018, Plaintiff underwent an L5-S1 lumbar interlaminar epidural steroid injection proceduere. (*Id.* at PageID.521). In December 2018, she underwent an L5-S1 transpedicular minimally invasive discectomy with intraoperative discogram procedure. (*Id.* at PageID.523). The notes indicate that despite being treated with medication management, wearing the appropriate back brace, being treated with physical therapy and other home exercise programs, and receiving injection treatments she had not experienced sustained lasting improvement to relieve her back pain and disability. (*Id.* at PageID.523). Plaintiff rated the pain as moderate in severity, between a three and six on a 10-point scale, with an aching quality. (*Id.* at PageID.526). Further, she reported experiencing joint pain and stiffness, back

pain and difficulty walking. (*Id.* at PageID.529). The physical examination displayed that while she had normal stability, her spinal range of motion was limited. (*Id.*).

From October to November 2018, she reported her pain ranged between a three and seven on a 10-point scale. (*Id.* at PageID.548, 554). And reported experiencing joint pain, weakness, and stiffness, muscle pain, cramps and weakness, and difficulty walking. (*Id.* at PageID.551, 557).

In December 2018, she underwent a discectomy and experienced relief shortly after but this was short-lived. (*Id.* at PageID.537). Less than a week later, she reported experiencing greater pain than before undergoing the surgery, she experienced difficulty showering and lifting her legs, inability to walk upstairs, awakening throughout the night due to the pain, and found her medication was not alleviating the pain. (*Id.*). However, her notes also reflect she reported experiencing approximately 40% relief from pain and seeing some improvement in functionality due to the prescribed medications and treatments. (*Id.* at PageID.542). On a scale of 1 to 10, her pain ranged between a three and a seven. (*Id.*).

In January 2019, she reported continuing to experience low back pain which ranged between three and eight on a 10-point scale. (*Id.* at PageID.532). That same month she reported experiencing about 50% relief of pain and some improvement in her functionality due to the prescribed medications and treatments "as evidenced by

8

improvement in her physical functioning and [tolerance] of everyday activity." (*Id.*). She also reported experiencing joint pain, stiffness, and weakness, muscle weakness, pain and cramps, back pain, and difficulty walking. (*Id.* at PageID.535, 540).

From February to March 2019, she continued to (i) complain of low back pain and (ii) rated it as moderate (i.e., ranging between a three and eight on a 10-point scale). (*Id.* at PageID.561, 567). The pain was also radiating into both legs and she complained of worsening bilateral lower extremity weakness. (*Id.*). She also continued to complain of joint pain, weakness, and stiffness, muscle weakness, fractures, difficulty walking, and back pain. (*Id.* at PageID.564, 570).

In April 2019, she reported experiencing pain between a four and an eight on a 10-point scale but expressed noticing about 60% relief of pain with some improvement in function due to the medication she was taking. (*Id.*). She reported that the amount of pain relief she was experiencing was making "a real difference in her life." (*Id.* at PageID.573).

In June 2019, Plaintiff reported her back pain had worsened and she now rated it as 10 out of 10 accompanied by an aching and shooting quality, and expressed that the pain was now unbearable. (*Id.* at PageID.612). She had not experienced any relief in pain or functionality. (*Id.*). She continued to report joint pain, swelling, and stiffness, muscle weakness, pain, and spasms, fractures, and difficulty walking. (*Id.* at PageID.615). She underwent an MRI the same month and a "central disc

herniation with a superior migrating disc fragment" was noted again. (*Id.* at PageID.618, 620–21). Her July 2019 progress notes again reflected Plaintiff experienced zero relief and significant pain. (*Id.* at PageID.623). Plaintiff's medical examinations from July 2019 remained largely the same. (*Id.* at PageID.633–34). Plaintiff was scheduled to undergo surgery for potential instrumentation placement across the level of the fracture in early August but cancelled due to personal reasons. (*Id.* at PageID.680, 682).

In September 2019, Plaintiff continued to complain of low back pain as well as right leg pain. (*Id.* at PageID.680). During her physical examination, it was noted that Plaintiff's motor examination revealed "5/5 strength throughout proximally distally," particularly in her bilateral lower extremities. (*Id.* at PageID.681). Plaintiff was able to complete a full squat, bend forward all the way, and raise both thighs to her chest which she had not been able to do before. (*Id.*). Last, her gait appeared to be completely normal and she had no signs of ataxia. (*Id.*). The physician's notes indicate he expressed to Plaintiff that he was reluctant to consider any surgical intervention at that time and recommend she focus on other issues such as her family before considering undergoing surgery. (*Id.* at PageID.682). Further, the physician recommended she focus on her pain management as he was did not "have a good recommendation [ ] of what kind of surgery or if any surgical intervention [would] help [Plaintiff's] current situation." (*Id.*).

10

In January 2020, Plaintiff underwent a CT scan of her lumbar spine. The findings indicated the "thoracolumbar spine demonstrate[d] moderate to marked compression deformity of the L1 vertebral body." (*Id.* at PageID.687). The ultimate impressions reflected stable compression deformity of L1 with interval vertebroplasty and L3-4 central disc protrusion which was causing mild narrowing of the spinal canal. (*Id.* at PageID.687).

In May 2020, Plaintiff underwent an MRI of her cervical spine and the ultimate impression was there was no large extruded herniated cervical disc, no cervical spinal canal stenosis or cervical spinal cord compression, no abnormal signal change in the cervical spinal cord, and no cervical vertebral body compression deformity. (*Id.* at PageID.688). In December 2020, Plaintiff underwent another MRI which noted the presence of an "L1 vertebral body compression fracture" which was stabilized by means of kyphoplasty. (*Id.* at PageID.702).

In regard to her mental issues, Plaintiff saw Dr. Sher from Sher Psychiatry for several months. (*Id.* at PageID.351– 66). Her medication management notes indicate that from July 2018 to January 2019, she experienced anxiousness and at times would report experiencing depression, but consistently had an appropriate affect, logical thought process, normal motor skills, and intact attention/concertation. (*Id.* at PageID.356–81). Notably, around August 2018 the treatment notes indicate there was an increase in the frequency or intensity of

apprehension, anxiety, and difficulty concentrating.  (*Id.* at PageID.362).  Also, the exam notes indicate that Plaintiff had a friendly demeanor, although she appeared sad, appropriate affect, displayed logical thinking, was cooperative and attentive during the meeting but easily distracted.  (*Id.* at PageID.362).

### b.  Plaintiff's Treatment Doctor Opinion

On October 14, 2020, Physician Assistant Bradley Jones submitted a medical note which described Plaintiff's condition of a compression fracture of her lumbar vertebra, and herniation of her intervertebral disc.  (ECF No. 4-1, PageID.697).  And advised that Plaintiff was disabled from any form of work from October 14, 2020 to December 10, 2020.  (*Id.*).  Jones issued similar letters in May 2021, February 2022, and August 2022.  (*Id.* at PageID.27, 40, 731).

### c.  State Agency Medical Consultants Reports

### 1.  Dr. Edward Brophy, D.O.

Dr. Edward Brophy, D.O. reviewed Plaintiff's file and issued a consultant report regarding her condition on September 13, 2019.  In the report, Plaintiff's main impairments were identified as (i) fracture of vertebral column with spinal cord lesion, (ii) obesity, (iii) essential hypertension, (iv) anxiety and obsessive-compulsive disorders, (v) depressive, bipolar, and related disorders, and (vi) attention deficit/hyperactivity disorder.  (ECF No. 4-1, PageID.116).  Plaintiff's symptoms were identified as pain and weakness and Dr. Brophy found that one or

12

more of her medically determinable impairments could reasonably be expected to produce the pains or symptoms. (*Id.* at PageID.117). Further, her statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence alone. (*Id.*). He found that she could occasionally lift and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 4 hours, sit for about 6 hours in an 8-hour workday, push and/or pull with no limitations, other than shown for lift and/or carry, and postural limitations. (*Id.* at PageID.118). Plaintiff's postural limitations entail of occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling; frequently balancing; and never climbing ladders, ropes, or scaffolds. (*Id.*). She also has the following environmental limitations: avoid concentrated exposure to extreme cold, vibration, and hazards (e.g., machinery, heights, etc.). (*Id.* at PageID.119).

### 2.  Dr. Joe DeLoach, Ph.D.

Dr. Joe DeLoach, Ph.D. also reviewed Plaintiff's file and provided a mental residual functional capacity assessment report dated September 24, 2019. (ECF No. 4-1, PageID.119). He found that she had sustained concentration and persistence limitations but no limitations on understanding and memory. (*Id.* at PageID.120). He assessed she was moderately limited in her ability to (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods of time,

and (iii) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods. (*Id.*). However, she was not significantly limited in her ability to (i) carry out very short and simple instructions, (ii) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (iii) sustain an ordinary routine without special supervision, (iv) work in coordination with or in proximity to others without being distracted by them, and (v) make simple work-related decisions. (*Id.*). He went on to explain that Plaintiff's ADHD, depression, and anxiety produce "mild to moderate limitations in concentration and persistence," however she demonstrated concentration and persistence adequate for simple work tasks. (*Id.*).

Dr. DeLoach also assessed that Plaintiff has social interaction limitations. (*Id.*). Her ability to interact appropriately with the general public is moderately limited. (*Id.*). But she was not significantly limited in her ability to (i) ask simple questions or request assistance, (ii) accept instructions and respond appropriately to criticism from supervisors, (iii) get along with coworkers or peers without distracting them or exhibit behavioral extremes, and (iv) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.* at PageID.120–21). Dr. DeLoach noted that while Plaintiff's depression and anxiety produced mild to moderate limitations in social interactions, she was cooperative with her treating

sources and appeared capable of limited social interactions.  (*Id.* at PageID.121).  In sum, Dr. DeLoach found Plaintiff's "understanding and memory are adequate for simple tasks.   Concertation and persistence are moderately limited.   Social functioning is moderately impaired and adaption is adequate for the competitive work environment. [It] [a]ppears that [her] symptoms are stable and improving on meds.  [Plaintiff] would likely need to work alone or in a job which requires no to minimal contact with the public and work associates.  [Plaintiff] retains the capacity to perform simple tasks on a sustained basis."  (*Id.*).

### d.  Plaintiff's Function Report

In her function report, Plaintiff indicated that prior to her illness she was able to work as a cosmetologist, and cared for her family and pets without assistance from others.  (ECF No. 4-1, PageID.286).  Now, as soon as she wakes up in the morning she must take medication for her pain, blood pressure, and high heart rate.  (*Id.*).  On average, she only sleeps about four to six hours a night due to the pain in her leg and back.  (*Id.*).  To mollify the pain, she will typically get up, walk around, and either take a hot shower or apply a hot or cold compress to the painful area.  (*Id.*).

While she cares for her daughter fulltime, she needs assistance from her mother to transport her to and from school, and feed and bathe her.  (*Id.*).  Plaintiff also cares for her pets by providing them with food and water multiple times a day and letting them outside with assistance from her mom.  (*Id.*).

In regard to her personal care and household tasks, she needs assistance dressing herself, bathing, styling her hair, shaving, grocery shopping, unloading items from the car, cooking, cleaning, and doing laundry. (*Id.*).  While she is able to feed herself, she typically cannot cook any meals. (*Id.* at PageID.287).  Since, her accident she has only been able to prepare meals one to two times a week, and it typically takes her between 45 to 60 minutes while taking a break to sit or walk around every 15 minutes. (*Id.)*.  She also needs reminders to take a shower and take her medication. (*Id.*).  She is unable to complete house or yard work due to her injury. (*Id.* at PageID.288).  Further, her back injury worsened her depression and anxiety which makes it difficult for her to complete tasks. (*Id.* at PageID.287).

She is able to go outside daily to watch her daughter walk to and from the bus stop but otherwise she does not spend a lot of time outside. (*Id.* at PageID.288). When she does go out, she usually travels by car but only drives when no one else is available to drive her. (*Id.*).  And mostly she leaves the house to go to doctor's appointments. (*Id.* at PageID.289).  She completes most of her shopping by phone, mail, or on the computer. (*Id.* at PageID.288).  She is able to pay her bills, count change, manage a savings account, and use a checkbook. (*Id.*).

As to her hobbies and interests, due to her back pain she mostly watches television and has not picked up any new activities. (*Id.* at PageID.289).  She spends time with her family when they come to visit her  or when they are speaking over

FaceTime. (*Id.*). She does not engage in many social activities due to her injury and no longer has any friendships. (*Id.* at PageID.290). She and her husband have also separated, and she now lives with her parents who assist her on a daily basis. (*Id.* at PageID.290, 296). She is able to get along with authority figures well and has never had any issues. (*Id.* at PageID.290).

Plaintiff's injuries affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, and use her hands. (*Id.*). She can only walk about five feet, and she would have to rest for about 30 to 45 minutes with a cold or hot compress on a good day, but on average she needs to rest about two to three hours after walking. (*Id.*). She uses a back brace whenever she is standing to complete a task. (*Id.* at PageID.291). She can only pay attention in increments of 10 to 15 minutes, and is unable to follow instructions well due to her ADHD. (*Id.* at PageID.290).

### 2. Overview of Hearing Testimony

#### a. Plaintiff's Testimony

On April 20, 2018, Plaintiff was thrown from a horse. (ECF No. 4-1, PageID.71). Starting on June 19, 2019, Plaintiff's daily routine comprises of rising early in the morning, immediately taking her pain medication, spending some time stretching in bed before calling one of her parents to assist her in getting up, and using the restroom. (*Id.* at PageID.81–82). For the first four to five hours of the

morning, she is unable to sit up "like a normal person would." (*Id.* at PageID.82). Once she is able to rise, she spends some time traveling between her bedroom and her daughter's. (*Id.*).

On a typical day, she spends a significant amount of time watching television shows on streaming services and taking naps. (*Id.* at PageID.84). And due to the pain she alternates placing ice and heat on her spine and lumbar extractions throughout the day, and will periodically elevate her legs as her legs and feet "turn purple and blue." (*Id.* at PageID.84). Either her mother or father will provide her with her daily meals. (*Id.*). They also do her grocery shopping and laundry for her. (*Id.*). Plaintiff testified that her mother "just really took full care of [her] daughter and [her] dogs for [her]." (*Id.* at PageID.85).

Her daily attire consists of loose-fitting clothing (e.g., pajama pants or yoga pants), and slip on shoes as she is unable to reach her feet. (*Id.*). Due to the pain, she is only able to bathe once or twice a week with the assistance of her mother. (*Id.* at PageID.85–86). When she was married, her husband would assist her with such tasks.[2] (*Id.* at PageID.97–98). She was unable to shave, and experienced incontinency. (*Id.* at PageID.86).

She is able to feed herself, but is unable to stand up long enough to microwave a dinner. (*Id.* at PageID.87). She is also unable to complete housework or yardwork,

---

[2] Plaintiff and her husband divorced in 2020. (*Id.* at PageID.98).

and that remains true to date.  (*Id.*).  During this period, she reported her pain at a level 10 on a 10-point scale.  (*Id.*).  She also had no hobbies or interests, and this remains true today.  (*Id.* at PageID.88).

Plaintiff has not been able to return to work as a cosmetologist due to her pain which makes it impossible for her to sit, stand, lay, bend, lift, or reach.  (*Id.*).  She does not walk around very often but must move around every few minutes while suffering from muscle spasms as well as trembles. (*Id.* at PageID.88–89).  She has used three different back braces since June 2019.  (*Id.* at PageID.89).  And typically wears her back brace when she had to walk around the house or go to a doctor's office to protect her back and spine.  (*Id.*).

Plaintiff then provided a detailed overview of her work history.  She was a licensed cosmetologist, and her license covered hair care as well as manicures.  (*Id.* at PageID.92).  From 2007 to 2008, she worked at Regis and Cutters as a cosmetologist.  (*Id.* at PageID.90, PageID.300–04, 320).  In this capacity she provided a range of services (e.g., wash, cut, color, style, etc.).  (*Id.* at PageID.91).  She also provided facial waxing services.  (*Id.* at PageID.92).  She then moved to another salon, where she worked from 2009 to 2015.  (*Id.* at PageID.93).  Plaintiff is currently licensed, and keeps her license current.  (*Id.* at PageID.92).  Since she has not been working, her family has assisted her financially.  (*Id.* at PageID.94).

As to her mental health, while she is still sees her psychiatrist quarterly, she does feel as if she is getting better.  (*Id.*).

### b. Vocational Expert's Testimony

Melissa Hennessey, Vocational Expert ("VE"), testified during Plaintiff's hearing.  She testified that Plaintiff's previous position as a cosmetologist had the DOT code of 332.271-010, with an SVP of 6, skilled, at the light duty range, and performed at medium.  (ECF No. 4-1, PageID.101).

After collecting this information from the VE, the ALJ asked she assume they have someone such as the claimant, at the same age, with the same education, and previous work experience limited to the full range of a light exertional job with non-exertional limitations at hand.  (*Id.* at PageID.102).  The ALJ then posited the following hypothetical:

> This person could only occasionally climb stairs, or crouch, or crawl, or kneel, stoop, or bend.  But she would not be able to work around hazards, and that means she could not climb ladders, ropes, or scaffolding, or work at unprotected heights or around dangerous, moving machinery.  And she would also be limited to work that's considered unskilled work, being work that's simple, routine work, which is work that requires only simple decisions and no complex decisions, and which is not at a production rate pace.  With those limitations, taking into consideration this past work, do you think that hypothetical person could do the work of a cosmetologist, as you've classified it, or as it was performed by our claimant?

(*Id.* at PageID.102–03).  The VE testified that such a hypothetical person would be unable to work as a cosmetologist as performed by Plaintiff or as generally performed.  (*Id.* at PageID.103).  However, such a person could perform the following jobs:

- Officer helper, DOT Number 239.567-010, SVP of 2, with a light physical demand, and 93,000 jobs in the national economy;

- Information clerk, DOT Number 237.367-018, SVP of 2, with a light physical demand, and 52,000 jobs in the national economy; and

- Mail clerk, DOT Number 209.687-026, SVP of 2, with light physical demand, and 35,000 jobs in the national economy.

(*Id.* at PageID.103).  The ALJ further restricted the hypothetical and included the condition that the individual would be sedentary.  (*Id.*).  The VE testified that such an individual would be able to work the following positions:

- Address clerk, DOT Number 209.587-010, SVP of 2, sedentary, with 18,000 jobs in the national economy;

- Order clerk, DOT Number 209.567-014, SVP of 2, sedentary, with 13,000 jobs in the national economy; and

- Final assembler, DOT Number 713.687-018, SVP of 2, sedentary, with 21,000 jobs in the national economy.

(*Id.* at PageID.103–04).  The ALJ then added a limitation for occasional use of the left lower extremity for foot controls.  (*Id.* at PageID.104).  The VE testified that this limitation would not affect any of those jobs.  (*Id.*).  The VE went on to testify that the order clerk, information clerk, and office helper positions would all have the sit/stand option.  (*Id.*).  She also testified that a sit/stand option would also be available for a surveillance system monitor position, DOT number 379.367-010, SVP of 2, with 17,000 jobs in the national economy, and a document preparer, DOT number 249,587-018, sedentary, SVP of 2, with 53,000 jobs in the national economy.  (*Id.* at PageID.104–05).  If the hypothetical person needed to take breaks throughout the workday, this would be work preclusive in unskilled work and not tolerated.  (*Id.* at PageID.105).  And if the hypothetical person needed to be absent twice a month on a constant basis, they would most likely be terminated by the time they reach six or seven occurrences.  (*Id.* at PageID.105–06).

The VE confirmed that majority of her testimony was consistent with the Dictionary of Occupational Titles and its companion the Selected Characteristics of Occupations.  (*Id.* at PageID.106).  Her testimony regarding ability to work from a seated or standing position, "absenteeism, additional breaks, use of the left lower extremity, production rate pace, and workplace hazards" was based on her work experience and training as a vocational counselor.  (*Id.*).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

    (i)     A licensed or certified psychologist at the independent practice level; or

    (ii)     A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or

hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)    Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)    Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)    Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

24

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a).  "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability."  This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3).  This factor will include the analysis of:

(i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative

medical finding." *Id.*, § 404.1520c(c)(5).  "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this

27

section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g.,

abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other

31

symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may

affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)      Treatment, other than medication, . . . received for relief of . . . pain;

(vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this

treatment is expected to restore your ability to work." *Id.*, § 404.1530(a).  Stated

differently, "[i]f you do not follow the prescribed treatment without a good reason,

we will not find you disabled or, if you are already receiving benefits, we will stop

paying you benefits." *Id.*, § 404.1530(b).  Acceptable (or "good") reasons for failure

to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.  Argument and Analysis

In sum, Plaintiff's summary judgment requests the Court find that the ALJ's

decision is not supported by substantial evidence.  However, the undersigned does

not find Plaintiff's arguments persuasive.

### 1.  The ALJ Appropriately Considered and Categorized Plaintiff's Impairments

Plaintiff argues the ALJ failed to discuss her sleep issues/insomnia, lumbar disc issues, and radiculopathy affecting the lower extremities which are factors that significantly limit her ability to perform work related activities, and as such were severe impairments.  (ECF No.7, PageID.817).  Further, Plaintiff argues that her condition "would lead to an excessive number of absences and an inability to maintain sustained concentration and pace for even unskilled work."  (*Id.* at PageID.818).  The Commissioner contends that the ALJ's Step Two finding is supported by substantial evidence.  (ECF No. 9, PageID.830, 832).

A severe impairment is defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities," 20 C.F.R. § 404.1520(c), and which lasts or can be expected to last "for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, puling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404,1521(b).  An impairment "can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers*, 486 F.3d at 243).

At step two, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Serv.*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ found the following impairments severe: a fracture of the lumbar vertebrae, with spinal cord lesion, obesity, anxiety, depression, and attention-deficit hyperactivity disorder. (ECF No. 4-1, PageID.47). The ALJ also noted Plaintiff suffered from hypertension, but found it to be non-severe because there was no evidence of end organ damage or more than conservative treatment being taken. (*Id.* at PageID.47).

Plaintiff argues that the ALJ committed an error by not finding her radiculopathy to be a severe impairment. First, as discussed above, where an ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe another impairment constitutes harmless error as long as the ALJ considered the entire medical record in rendering her decision. *Maziarz*, 837 F.2d 240. Here, the ALJ found Plaintiff's lumbar vertebrae fracture, among other impairments, to be

severe and following that finding continued her analysis.  Thus, even if she was incorrect in not finding Plaintiff's radiculopathy to be severe this would be considered harmless error.

Plaintiff does not highlight why her radiculopathy should be considered a severe impairment in this case.  (*See generally* ECF Nos. 7, 10).  To support this position Plaintiff points to multiple records discussing the radicular pain she experienced which was persistent and worsening in intensity and duration, the muscle pain/cramps, difficulty walking, joint swelling, and a number of other symptoms associates with her lumbar disc issues.  (ECF No. 10, PageID.855).  However, what Plaintiff fails to indicate is how these complaints of pain are different from the pain associated with her lumbar vertebrae fracture that the ALJ recognized as a severe impairment.  In fact, the medical records she points to that discuss her radiculopathy and the associated symptoms include references of symptoms discussed in the ALJ's decisions.  (*See* ECF No. 4-1, PageID.51–2 (referencing "persistent back pain," "bilaterally radicular pain causing pain when standing, paresthesia, and a limping gait").  Thus, although the ALJ did not find Plaintiff's radiculopathy to be a severe impairment, it is clear from the discussion that she considered the condition and the associated symptoms.

Next, Plaintiff speculates that her record references to insomnia evidence an impact to her ability to complete full time work.  The Court finds this argument

unpersuasive.  First, Plaintiff does not identify a medical record diagnosing her with insomnia, and only points to her self-reports of experiencing insomnia.  (*See, e.g.,* ECF No. 4-1, PageID.580, 582, 584, 615).  Even if Plaintiff's record contained a diagnosis for insomnia this does not inform her limitations or ultimately her disability.  *See Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted).  Next, she offers no medical evidence of the consequence or affect her alleged insomnia has on her.  Despite this lack of evidence, the ALJ's decision considered and discussed her need to take naps.  She specifically indicated that although Plaintiff notes that she naps throughout the day, this was not consistent with the record which was void of "any reports from the claimant or recommendations from her treatment providers that she . . . take naps prior to the Date Last Insured."  (ECF No. 4-1, PageID.53).  This discussion demonstrates that the ALJ considered Plaintiff's representation that she needs to take naps throughout the day and found it to be inconsistent with the record.  *Coston v. Saul*, No.20-12060, 2022 WL 1518124, at *9 (E.D. Mich. Jan. 24, 2022).

Thus, the ALJ's decision not to include Plaintiff's sleep issues/insomnia, lumbar disc issues, and radiculopathy as severe impairments does not constitute reversible error.

### 2. The ALJ Did/ Did Not Misinterpret the Medical Records She Relied Upon

Plaintiff argues the ALJ misinterpreted the statement made by Dr. Andrey Volkov, the consulting neurologist, that pain management was not an important issue for Plaintiff at the time and that while severe, her lumbar condition was not disabling.  (ECF No. 7, PageID.819 (citing ECF 4-1, PageID.682)). The relevant portion of Dr. Volkov's opinion at issue reads as follows:

> I do believe that at this time the patient should focus on the pain management portion of her treatment given the fact that I do not believe that at this time I have a good recommendation terms of what kind of surgery or if any surgical intervention can help the patient's current situation.  I do not believe that this is an important issue at this time and I believe she should focus more on her family issues.   Even though the patients pain management physician did state that she needs surgical intervention at this time I am reluctant to offer a long given the fact that I am not 100% sure what type of surgical intervention will help the patient's current chronic problems.

The portion of the ALJ's decision which discusses Dr. Volkov's opinion reads as follows:

> Ongoing surgical intervention was planned due to her pain, but imaging was generally stable, and in spite of limited forward flexion of the spine, she was stable, facet loading and SI stress testing was negative and she had normal strength and tone.  The surgery was cancelled due to personal reasons and her treatment providers then noted reluctant to proceed, stating that she should instead focus on pain management, posture evaluation, and weight loss.  Additionally, he stated that the pain management was not an important issue at the time.  Therefore, while severe, her lumbar condition (exacerbated by her obesity) is not disabling.   (internal citations omitted).

(ECF No. 4-1, PageID.53).

Plaintiff argues that the ALJ "misapprehended the doctor's statement, construed it to mean the opposite of what he stated, and then based her decision on that mistaken impression." (ECF No. 7, PageID.819). A plain reading of the ALJ's summary shows that the ALJ did not misinterpret Dr. Volkov's opinion. Further, the ALJ's ultimate finding that Plaintiff was not disabled was not based solely on Dr. Volkov's opinions. The decision includes an extensive discussion of Plaintiff's medical record, Plaintiff's testimony, and the state agency treatment doctor's opinions. (ECF No. 4-1, PageID.51–56). Dr. Volkov's opinion was merely one medical opinion that the ALJ considered when issuing her ruling. Further, the physical examination notes from Plaintiff's visit that day undermines Plaintiff's position that substantial evidence does not exist to support a finding of not disabled. The notes reflect that during that visit Plaintiff's motor examination revealed "5/5 strength throughout proximally distally," particularly in her bilateral lower extremities. (ECF No. 4-1, PageID.681). She was able to complete a full squat, bend forward all the way, and raise both thighs to her chest which she had not been able to do before. (*Id.*). And last, her gait appeared to be completely normal and she had no signs of ataxia. (*Id.*). This demonstrates that the ALJ's ultimate finding was not based on Dr. Volkov's opinion alone, and even if it was substantial evidence existed in the record itself to support a finding of not disabled under the Social

Security Act.  Thus, the ALJ's decision demonstrates that the finding was arrived at and supported by the totality of the medical evidence.  (*See* ECF No. 4-1, PageID.51–53).

As unfortunate as Plaintiff's circumstances are, the Undersigned finds that the ALJ's decision is supported by substantial evidence.

### H.  ORDER

For these reasons, I conclude that substantial evidence supports the Commissioner's denial of benefits.  Thus, Plaintiff's motion (ECF No. 7) is **DENIED,** the Commissioner's motion (ECF No. 9) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

Date: February 1, 2024                      S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge